**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| DELILAH WILLIAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 2:17-cv-00781-RDP |
| HOOVER CITY BOARD OF | ) |
| EDUCATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OPINION

This case is before the court on Defendant's Motion for Summary Judgment. (Doc. # 41). The parties have fully briefed the Motion (Docs. # 42, 47, 50), and it is under submission. After careful review, and for the reasons explained below, the court concludes that Defendant's Motion for Summary Judgment is due to be denied.

## I.    Factual Background[1]

The Hoover City Board of Education contracts with a staffing company, Appleton Plus People Corporation, to provide instructional aides who assist the Board's teachers in classrooms at Hoover City schools. Plaintiff Delilah Williams was an instructional aide employed by Appleton who worked in Hoover City schools. In October 2015, about half way through her first semester at Green Valley Elementary School, Principal Jeffrey Singer had Plaintiff removed

---

[1] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

from her placement at Green Valley. Plaintiff contends his decision to remove her was motivated in part by her sex and her pregnancy.

Plaintiff began employment with Appleton in the spring of 2015. (Plaintiff's Deposition at 15-18).[2] After she applied for several positions through Appleton's website, an Appleton representative notified her that she would have an interview at Trace Crossings Elementary. (*Id.* at 15-17). Plaintiff interviewed at Trace Crossings with the school principal and the teacher she would be working under, and was subsequently offered a position as a special education instructional aide. (*Id.* at 17-18). She began work at Trace Crossings in March 2015. (*Id.* at 18).

Plaintiff was assigned to provide one-on-one assistance to a particular student, J.H., at Trace Crossings. (*Id.* at 18). Plaintiff provided assistance to J.H. for the remainder of the spring 2015 semester. (*Id.* at 19). Once the school year ended, Plaintiff expected to receive an email from Appleton telling her whether she would be returning to Trace Crossings for the following school year or instead moving to another school. (*Id.* at 20).

After the school year ended, Plaintiff received an email from Appleton representative Theresa Hundley telling her that she would start the 2015-16 school year at Green Valley Elementary, another Hoover City elementary school. (*Id.* at 21). Hundley was Appleton's program manager for the Hoover City Board of Education. (Hundley Deposition at 11).[3] In that role, Hundley was responsible for managing Appleton's contract with Hoover City Schools and for placing Appleton employees in Hoover schools as both instructional aides and substitute teachers. (*Id.* at 11-13). Plaintiff was reassigned from Trace Crossings to Green Valley because

---

[2] Plaintiff's deposition transcript, referred to as "Plaintiff's Deposition," is located in Document # 43-2. This Memorandum Opinion cites the minuscript pages of that deposition. When citing exhibits to Plaintiff's or any other person's deposition, this Memorandum Opinion cites the electronically generated CM/ECF page numbers.

[3] Theresa Hundley's deposition transcript, referred to as the "Hundley Deposition," is located in Document # 43-3. This Memorandum Opinion cites the minuscript pages of that deposition.

J.H., the student Plaintiff had been assisting at Trace Crossings, was moving to Green Valley. (Goodwin Deposition at 23-24).[4] The Hoover officials who requested that Plaintiff be moved to Green Valley with J.H. thought the move would be beneficial because Plaintiff already knew J.H. and had an established relationship with him. (*Id.* at 24; Singer Deposition at 42-44).[5]

Plaintiff began working at Green Valley in August 2015, the beginning of the school year. (Plaintiff's Deposition at 22). While at Green Valley, Plaintiff worked in a behavioral assessment classroom designed for students with academic, behavioral, or emotional needs. (Singer Deposition at 35, 38). The primary teacher in that classroom was Leigh Windsor, who was assisted by two instructional aides—Plaintiff and another female aide named Tameka Lewis. (*Id.* at 37-38; Plaintiff's Deposition at 28). Initially, only two students (including J.H.) were assigned to the behavior assessment class at Green Valley. (Plaintiff's Deposition at 26). Plaintiff and Lewis shared responsibility for meeting the needs of each student. (*Id.* at 28-29).

The parties dispute what happened next. The Board claims that Plaintiff's performance in the classroom suffered as the semester progressed, which ultimately led Green Valley Principal Jeffrey Singer to remove Plaintiff from her position. Teashia Goodwin, a clinical psychologist who occasionally worked in Plaintiff's classroom, testified that Plaintiff would sometimes sit at the back of the classroom on her phone instead of actively engaging her students. (Goodwin Deposition at 7, 26-27, 33). Goodwin also testified, however, that she did not communicate her concerns about Plaintiff to Principal Singer. (*Id.* at 34-35).

Principal Singer testified that Windsor had come to him with concerns about Plaintiff's classroom performance and that he had noticed that J.H. was not responding well to Plaintiff in

---

[4] Teashia Goodwin's deposition transcript, referred to as the "Goodwin Deposition," is located in Document # 43-6. This Memorandum Opinion cites the minuscript pages of that deposition.

[5] Jeffrey Singer's deposition transcript, referred to as the "Singer Deposition," is located in Document # 43-4. This Memorandum Opinion cites the minuscript pages of that deposition.

the classroom. (Singer Deposition at 74-75, 82-84). Singer also testified that Windsor may have told him that Plaintiff sometimes napped and worked on her college coursework in the classroom, and that Plaintiff questioned some of the things Windsor would ask her to do. (*Id.* at 85-86, 110-111). In particular, Singer said that Plaintiff questioned some of the de-escalation practices Windsor would use when dealing with students. (*Id.* at 111). Based on these concerns, Singer asked Appleton program manager Theresa Hundley to remove Plaintiff from Green Valley in October 2015. (Singer Deposition at 127; Hundley Deposition at 38, 40- 42, 55-56).

Plaintiff tells a very different story and points to different evidence in the Rule 56 record. Near the end of August, Plaintiff went to Singer and told him she was pregnant. (Plaintiff's Deposition at 48-49; Singer Deposition at 63-68). Singer responded by saying something along the lines of "you and your husband didn't waste any time, did y'all." (Plaintiff's Deposition at 49; Singer Deposition at 66). After Windsor learned of Plaintiff's pregnancy, she also had a conversation with Singer, apparently because she (Windsor) had some concern about Plaintiff's pregnancy. (Plaintiff's Deposition at 39-40, 45). The following day, Plaintiff told Singer she was unsure why Windsor had approached him about her pregnancy, since he already knew she was pregnant. (*Id.* at 48). Singer responded that "he felt that [Windsor] was just being concerned and he was concerned as well." (*Id.*).

Sometime later, on October 5, 2015, Singer sent Hundley an email concerning Plaintiff. (Doc. # 43-4 at 49). Singer wrote that the student Plaintiff had been working with was not responding to her and that Plaintiff had expressed displeasure about her current working environment. (*Id.*). He explained that, "[i]f [Plaintiff] is not happy about the working environment, I understand. Originally, I wanted the class to have both a [male] and female aide."

(*Id.*).[6] Singer asked Hundley about the possibility of transferring a specific male aide (David Palmer) to Green Valley: "I know of an aide who is interested. . . . Currently, I believe he is working at another site. If there is a possibility of a transfer, however, I would like to meet with the candidate, Mr. David Palmer, first." (*Id.*).

On October 15, 2015, Singer met with Hundley to tell her that he did not want Plaintiff to continue working at Green Valley. (Singer Deposition at 121-27). Four days later, on October 19, 2015, Hundley called Plaintiff to tell her she would no longer be working at Green Valley. (Plaintiff's Deposition at 52; Hundley Deposition at 40-42). Sometime after this phone call, Plaintiff drafted a transcript of her conversation with Hundley from memory. (Plaintiff's Deposition at 69-70). Plaintiff's account of her conversation with Hundley reads as follows:

> [Hundley]: I was calling to let you know due to your situation, and do you have a situation.
>
> [Plaintiff]: What situation?
>
> [Hundley]: Are you expecting?
>
> [Plaintiff]: Yes.
>
> [Hundley]: Ok well due to your pregnancy the principal (Jeff Singer) at Green Valley Elementary has saw fit that you be replaced and no longer be employed with Green Valley Elementary School because of your situation he doesn't see fit for you to hold your position as a Special Ed. Aide. I was told to let you know that this is your last day of work with Green Valley Elementary School.
>
> [Plaintiff]: Say what now…Are you saying that I was let go due to my pregnancy or due to me not doing my job.
>
> [Hundley]: No they never said you weren't doing your job, I'm saying you were let go due to your situation of being pregnant.

---

[6] Singer's email actually reads: "Originally, I wanted the class to have both a female and female aide." (Doc. # 43-4 at 49). But in his deposition, Singer made clear that the use of "female" twice was a typo and that he had originally wanted "both a female and male aide." (Singer Deposition at 113-14).

[Plaintiff]: What am I supposed to do? I need a full time job, well I just had a full time job and work all day and you mean to tell me I am let go due to being pregnant. I just don't understand.

[Hundley]: There is always subbing but there might be a full time position at another school, give me until Friday of this week and if you don't hear from me by 12:00 pm give me a call and we can go from there.

[Plaintiff]: Ok thanks…

(Doc. # 43-2 at 31-32). Hundley denies ever making these statements to Plaintiff. (Hundley Deposition at 52-53). According to Hundley, she simply told Plaintiff that Green Valley had requested her removal and never said anything about Plaintiff's pregnancy. (*Id.* at 41-42).

Two weeks after Plaintiff's phone call with Hundley, on November 2, 2015, David Palmer began working at Green Valley. (Hundley Deposition at 54-55; Doc. # 43-3 at 37). On November 4, 2015, a Hoover City Schools administrator emailed Hundley to find out whether there had been "a change in personnel at Green Valley," and specifically whether there were "changes for [Plaintiff] at [Green Valley]." (Doc. # 43-3 at 37). Hundley responded: "[Plaintiff] has been switched with David Palmer [who] started on Monday." (*Id.*). Based on this evidence, Plaintiff contends that Singer removed her from Green Valley at least in part because of her sex and her pregnancy.

Though the parties dispute Singer's motivation for removing Plaintiff from Green Valley, they largely agree about what happened after Plaintiff was removed. The day after her phone call with Hundley, on October 20, 2015, Plaintiff filed for unemployment. (Plaintiff's Deposition at 53-54). On October 23, 2015, Hundley sent Plaintiff an email telling her that Appleton did not currently have a new position for her but that "[i]n the meantime, you can always be a sub for Hoover and other areas." (Doc. # 43-3 at 31). On December 1, 2015, Appleton sent Plaintiff an email about special education aide openings in the Birmingham area—including an opening in

the Hoover system that was the same kind of position she had previously filled at Green Valley. (Hundley Deposition at 46-47; Doc. # 43-3 at 32). Plaintiff never responded to Appleton's communications, and Appleton was unable to make further contact with Plaintiff. (Hundley Deposition at 47-48). In August 2016, Plaintiff was hired as a special education teacher at Lanier High School by the Montgomery County Board of Education. (Plaintiff's Deposition at 60). Plaintiff is happy at Lanier, and she has no desire to return to work for Hoover or Appleton. (*Id.* at 84, 89).

## II.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine dispute of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the nonmoving party to go beyond the pleadings and -- by pointing to affidavits, depositions, answers to interrogatories, or admissions on file -- designate specific facts showing that there is a genuine dispute for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

## III. Analysis

Plaintiff has asserted a single claim for sex and pregnancy discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2(a). (Doc. # 1 at 7). The Board's summary judgment motion requires the court to resolve two distinct questions. First, could a reasonable jury find that the Board was Plaintiff's employer for purposes of Title VII? Second, if so, could a reasonable jury find that the Board took some adverse action against Plaintiff that was motivated in part by her sex or her pregnancy? The court concludes that the answer to both questions is yes, and that the Board's summary judgment motion is therefore due to be denied.

### A. A Reasonable Jury Could Find That the Board Was Plaintiff's Employer

Only "employers" are subject to Title VII liability, and only "employees" enjoy Title VII protections. *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1359 (11th Cir. 1994); *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1242 (11th Cir. 1998). Thus, as a general rule, that means a plaintiff seeking relief under Title VII must show both that the defendant is an "employer" as defined by Title VII and that she is an "employee" of the defendant, as that term

is used for purposes of Title VII. *See Llampallas*, 163 F.3d at 1241-44; *Scott v. Sarasota Doctors Hosp., Inc.*, 688 F. App'x 878, 886 (11th Cir. 2017). There is no dispute in this case that the Board is an employer for purposes of Title VII.[7] But the parties are sharply divided over whether a reasonable jury could find that Plaintiff was an employee of the Board.

The court begins with a word about the requirement that Title VII plaintiffs be "employees." Title VII forbids employers from discriminating against "any individual" with respect to employment conditions. 42 U.S.C. § 2000e-2(a)(1). Despite the breadth of the term "individual," the Eleventh Circuit has held that "only those plaintiffs who are 'employees' may bring a Title VII suit." *Llampallas*, 163 F.3d at 1242;[8] *see also Peppers v. Cobb Cty.*, 835 F.3d 1289, 1297 (11th Cir. 2016) ("A Title VII workplace discrimination claim can only be brought by an employee against his employer."). The Circuit has taught us that such a construction is necessary because otherwise "any person could sue an 'employer' under the statute regardless of whether she actually had an employment relationship with that employer." *Llampallas*, 163 F.3d at 1243. Thus, a Title VII action generally will not lie if the defendant is *someone else's* employer, but not the plaintiff's. *See Scott*, 688 F. App'x at 886-88. However, the rule that a Title VII plaintiff must be an employee of the defendant has a both a wrinkle and an exception.

---

[7] Title VII defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b). Based on the Board's website, Plaintiff asserts that the Board has some two thousand employees, and the Board does not dispute that fact. (Doc. # 47 at 14).

[8] *Llampallas* also held that the requirement that a Title VII plaintiff be an "employee" was a jurisdictional one, such that a district court lacked jurisdiction to hear a Title VII claim by a plaintiff who was not an employee of the defendant. 163 F.3d at 1242-44. *Llampallas*'s jurisdictional holding was likely abrogated by *Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006). In *Arbaugh*, the Supreme Court held that a Title VII defendant's status as an "employer" under the statute was "an element of a plaintiff's claim for relief, not a jurisdictional issue." 546 U.S. at 516. That reasoning likely extends to a Title VII plaintiff's status as an "employee." *See Howell v. City of Lake Butler*, 2018 WL 904281, at *2-3 (M.D. Fla. Jan. 16, 2018). Thus, after *Arbaugh*, a Title VII plaintiff must still prove she is an "employee" to succeed on her claim, but the requirement that a Title VII plaintiff be an employee "is not a jurisdictional bar." *Id.* at *3.

The wrinkle is that multiple entities can sometimes serve as "joint employers" for Title VII purposes. *Scott*, 688 F. App'x at 886. Where a plaintiff works at one entity but is officially employed by another, the entities may sometimes be deemed joint employers of the plaintiff for purposes of Title VII. *See id.* at 880, 886. In such cases, even the entity that does not officially employ the plaintiff may be liable under Title VII. *See id.* Under the joint-employer doctrine, factfinders consider a variety of factors to determine whether an entity is the plaintiff's joint employer. *See id.* at 886-87 & n.12. These factors, discussed in more detail below, generally focus on "'the economic realities of the employment relationship viewed in light of the common law principles of agency and the right of the employer to control the employee,' which is the ultimate inquiry when determining whether an employment relationship existed." *Id.* at 887 n.12 (brackets omitted) (quoting *Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 341 (11th Cir. 1982)).

The exception to the rule is the third-party interference doctrine. In *Pardazi v. Cullman Med. Ctr.*, 838 F.2d 1155 (11th Cir. 1988), the Eleventh Circuit held that Title VII encompasses a claim that a defendant's discrimination "interfered with an individual's employment relationship with a third party." *Id.* at 1156. In that case, a physician alleged a hospital denied him staff privileges because of his national origin. *Id.* at 1155-56. The physician argued that the hospital's denial of privileges interfered with his existing employment contract with a medical practice, which conditioned the physician's employment upon him obtaining staff privileges at the hospital. *Id.* The Eleventh Circuit accepted the district court's finding that the physician was not an employee of the hospital, but it nonetheless held that the physician had a viable Title VII claim against the hospital. *Id.* at 1156. If the physician could "prove his claim that the hospital's discrimination against him interfered with his employment opportunities" with the medical practice, then "Title VII would encompass such a claim." *Id.* Thus, under *Pardazi*, a plaintiff

may succeed on a Title VII claim against a defendant that is not technically *her* employer if that defendant interfered with her employment relationship with a third party.

To survive summary judgment, Plaintiff's Title VII claim must fall under either the wrinkle or the exception. That is, a reasonable jury must be able to find either that the Board was Plaintiff's joint employer or that the Board interfered with Plaintiff's employment relationship with Appleton—or both. The court concludes a reasonable jury could find that the Board was Plaintiff's joint employer. It therefore need not address the third-party interference doctrine.

The Eleventh Circuit "has adopted the 'economics realities' test to determine whether a Title VII plaintiff is an employee." *Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1234 (11th Cir. 2004). The test was originally developed to determine whether a plaintiff was an employee or an independent contractor, *see Cobb*, 673 F.2d at 338-41, but the Eleventh Circuit has since extended the test to other contexts as well. *See Cuddeback* 381 F.3d at 1234 (applying economic realities test to determine whether a graduate research assistant was an employee of a state university). The court therefore holds that *Cobb*'s economic realities test is the proper standard for determining whether the Board was Plaintiff's joint employer for purposes of Title VII.

Under that test, the focus is on the economic realities of the parties' working relationship "viewed in light of the common law principles of agency and the right of the employer to control the employee." *Cobb*, 673 F.2d at 341. Though they certainly are not binding law, the Eleventh Circuit has stated that the factors listed in the Eleventh Circuit's pattern joint employers jury instruction "fairly target" the "ultimate inquiry" in determining whether an employment relationship existed. *Scott*, 688 F. App'x at 887 n.12. The eleven factors listed in the pattern instruction are:

1. The nature and degree of control over the employee and who exercises that control;

2. The degree of supervision, direct or indirect, over the employee's work and who exercises that supervision;

3. Who exercises the power to determine the employee's pay rate or method of payment;

4. Who has the right, directly or indirectly, to hire, fire, or modify the employee's employment conditions;

5. Who is responsible for preparing the payroll and paying wages;

6. Who made the investment in the equipment and facilities the employee uses;

7. Who has the opportunity for profit and loss;

8. The employment's permanence and exclusiveness;

9. The degree of skill the job requires;

10. The ownership of the property or facilities where the employee works;

11. The performance of a specialty job within the production line integral to the business.

*Id.* at 886-87. The pattern instruction further states: "Consideration of all the circumstances surrounding the work relationship is essential. No single factor is determinative. Nevertheless, the extent of the right to control the means and manner of the worker's performance is the most important factor." *Id.* at 887.

A review of the Rule 56 record and the relevant factors shows there is sufficient evidence for a reasonable jury to conclude that the Board was Plaintiff's joint employer. Rule 56 evidence suggests that factors one, two, four, six and ten support a finding that the Board was Plaintiff's joint employer. To be sure, other evidence (especially evidence relating to factors three, five, and eight) suggest that Plaintiff was employed solely by Appleton. And still other factors (seven, nine, and eleven) do not clearly favor either side. In light of this mixed evidence, it is for a jury to decide whether the Board was Plaintiff's joint employer.

As to the first and second factors (which are the most important), record evidence suggests the Board exercised a degree of control and supervision over Appleton aides like Plaintiff. Board employees like Principal Singer had the authority to assign Appleton aides to particular classrooms. (Singer Deposition at 49-50). For two or three weeks, Singer temporarily reassigned Plaintiff to a different classroom for part of the day to help another student. (*Id.* at 73-82, 128; Plaintiff's Deposition at 30-31). Additionally, Singer was generally involved in selecting which Appleton aides would be assigned to work at Green Valley Elementary. (Singer Deposition at 41-42, 48-51). For each aide position, Appleton would send a few candidates over to meet with Principal Singer, and he would communicate to Appleton which candidate seemed to be the best fit. (*Id.* at 49-51). Granted, Singer was not involved in selecting Plaintiff (because she simply followed a student she had worked with at another school to Green Valley), but this evidence nevertheless suggests that the Board played a role in deciding where particular Appleton aides would work. (*Id.* at 41-44). Indeed, before beginning her first assignment in the Hoover school system as an aide at Trace Crossing Elementary, Plaintiff was interviewed at Trace Crossings by the principal and teacher she would be working under. (Plaintiff's Deposition at 15-18).

Board employees were also responsible for supervising and directing the day-to-day activities of Appleton aides working in the Hoover schools. In fact, Plaintiff's Appleton supervisor, Theresa Hundley, did not maintain an office in the Hoover schools or school system administrative offices, but worked out of a separate office. (Hundley Deposition at 13-14). Plaintiff's day-to-day tasks were overseen by the Board's teachers in the classrooms where she worked. (Plaintiff's Deposition at 30-35; Singer Deposition at 32; Windsor Deposition at 26).

As to the fourth factor, though only Appleton could formally terminate aides like Plaintiff (Doc. # 43-1 at 3, ¶ 6; *id.* at 13, ¶ 4.1), the Board could request their removal from a particular school, and Appleton was required to comply with such requests. (Singer Deposition at 127; Hundley Deposition at 38, 40, 42, 55-56). Indeed, that is what happened to Plaintiff—she was removed from Green Valley at the direction of Principal Singer. (Hundley Deposition at 38, 40-42, 55-56). Moreover, removal from a particular school could result in a loss in compensation and loss of comparable employment opportunities with Appleton. In Plaintiff's case, Appleton did not immediately have another similar position available upon her removal from Green Valley and initially suggested that Plaintiff consider substitute positions in the meantime. (Plaintiff's Deposition at 54; Hundley Deposition at 42-44).

As to factors six and ten, it is undisputed that Plaintiff worked at schools that were owned and operated by the Board, not by Appleton. These factors thus weigh in favor of finding that the Board was one of Plaintiff's employers.

To be sure, other record evidence suggests that the Board was not Plaintiff's joint employer and that there were differences between "Board employees" and "Appleton employees." The Board's staffing services contract with Appleton provides that any Appleton aide placed in a Hoover school "shall at all times during the term of this Agreement be an employee of Appleton and shall not be an employee of the Board." (Doc. # 43-1 at 13, ¶ 4.1). Appleton aides are formally hired and trained by Appleton and then placed into particular positions at school systems that are clients of Appleton. (*Id.* at 3-4, ¶¶ 6-9). Appleton, not the Board, was responsible for paying Plaintiff, withholding taxes from her paycheck, maintaining workers compensation insurance, and providing employee benefits. (*Id.* at 5-6, ¶¶ 10-12). While

working in Hoover schools, Appleton employees are even required to wear name badges identifying themselves as Appleton employees. (Doc. # 43-1 at 8, ¶ 18).

From this and other evidence, a reasonable jury might well conclude that the Board was not Plaintiff's joint employer for purposes of Title VII. But, based on the opposing evidence discussed above, a reasonable jury could come out the other way. Contractual language describing a working relationship as other than an employer-employee relationship, though probative, is not controlling. *See Ashkenazi v. S. Broward Hosp. Dist.*, 607 F. App'x 958, 963 (11th Cir. 2015). In short, the relationship between Plaintiff and the Board appears to have been "complex and difficult to classify." *Scott*, 688 F. App'x at 888. It is the job of a jury, not the court on a motion for summary judgment, to sort through this competing evidence and determine whether Plaintiff was employed only by Appleton or by Appleton and the Board jointly. Summary judgment on the ground that Plaintiff was not an employee of the Board would therefore be improper.

**B. A Reasonable Jury Could Find That the Board's Decision to Remove Plaintiff Was Motivated in Part by Her Sex or Pregnancy**

Both sex discrimination and pregnancy discrimination are actionable under Title VII. *Holland v. Gee*, 677 F.3d 1047, 1054 (11th Cir. 2012) (explaining that discrimination on the basis of sex includes discrimination on the basis of pregnancy). Plaintiff claims that the Board's decision to have her removed from Green Valley was motivated in part by her sex and her pregnancy. (Doc. # 47 at 22-25). In mixed-motive cases like this one, a plaintiff survives summary judgment if she offers evidence from which a reasonable jury could conclude "(1) the defendant took an adverse employment action against the plaintiff; and (2) a protected characteristic was *a* motivating factor for the defendant's adverse employment action." *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1239 (11th Cir. 2016) (emphasis in original) (internal

quotation marks and brackets omitted). Plaintiff has offered such evidence, and the Board's motion for summary judgment is therefore due to be denied.

First, without question, Principal Singer's removal of Plaintiff from Green Valley constituted adverse employment action. To qualify as adverse employment action under Title VII, an employer's action "must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001). In other words, "an employee must show a *serious and material* change in the terms, conditions, or privileges of employment" to succeed on a Title VII claim. *Id.* (emphasis in original). Though Title VII "does not require proof of direct economic consequences in all cases," *id.*, such proof is generally sufficient to show adverse employment action. *See Bass v. Bd. of Cty. Comm'rs*, 256 F.3d 1095, 1118 (11th Cir. 2001) (actions of employer that "deprived [the plaintiff] of compensation which he otherwise would have earned clearly constitute[d] adverse employment actions for purposes of Title VII").

Singer's action of having Plaintiff removed from Green Valley deprived Plaintiff of compensation she otherwise would have earned while serving full time as an aide at Green Valley. Upon her removal from Green Valley, Appleton did not immediately have another similar position available for Plaintiff and initially suggested that Plaintiff consider substitute positions in the meantime. (Plaintiff's Deposition at 54; Hundley Deposition at 42-44). Thus, Singer's decision to remove Plaintiff resulted in a serious and material change in the terms and conditions of her employment. A reasonable jury could therefore find that Plaintiff's removal constituted adverse employment action.[9]

---

[9] The Board argues there was no adverse employment action because Plaintiff ignored Appleton's subsequent offers to reassign her to other comparable positions and instead filed for unemployment the day after she was removed from Green Valley. (Doc. # 42 at 27-28). But that argument goes to whether Plaintiff failed to properly mitigate damages following removal, which is a separate issue. If the Board can show at trial that Plaintiff failed to

Second, a reasonable jury could find that Plaintiff's sex or pregnancy was *a* motivating factor in Singer's decision to remove Plaintiff. As an initial matter, the Board argues that Plaintiff's account of the conversation in which Hundley allegedly told Plaintiff that Singer removed her because she was pregnant is inadmissible hearsay which the court may not consider on a motion for summary judgment. *See Macuba v. Deboer*, 193 F.3d 1316, 1322-25 (11th Cir. 1999); (Doc. # 42 at 32). Plaintiff responds that the statements are admissible under Federal Rule of Evidence 801(d)(2) because Hundley was the Board's agent and was authorized by the Board to make the statements. (Doc. # 47 at 26-27). But the court need not decide whether Hundley's statements to Plaintiff are admissible, and it does not consider them for purposes of this ruling, because other Rule 56 evidence is sufficient to create a triable issue of fact on Plaintiff's Title VII claim.[10]

That other Rule 56 evidence includes the following. In August 2015, the beginning of the school year, Plaintiff went to Singer and told him she was pregnant. (Plaintiff's Deposition at 48-49; Singer Deposition at 63-68). Singer responded by saying something along the lines of "you and your husband didn't waste any time, did y'all." (Plaintiff's Deposition at 49; Singer Deposition at 66). After Windsor learned of Plaintiff's pregnancy, she also had a conversation with Singer about the pregnancy, apparently because she had some concern about Plaintiff's pregnancy. (Plaintiff's Deposition at 39-40, 45). The following day, Plaintiff told Singer she was unsure why Windsor had approached him about her pregnancy, since he already knew she was

---

properly mitigated damages, that will reduce Plaintiff's recovery. *See Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1527-28 (11th Cir. 1991). But that is not a reason to grant summary judgment to the Board on liability.

[10] Because other clearly admissible Rule 56 evidence is sufficient to create a triable issue of fact, the court need not determine at this time whether Hundley's alleged statements to Plaintiff can be "reduced to admissible form" for trial (and therefore considered by the court at summary judgment). *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012). That issue may be raised, if appropriate, in a motion *in limine* before trial.

pregnant. (*Id.* at 48). Singer responded that "he felt that [Windsor] was just being concerned and he was concerned as well." (*Id.*).

Sometime later, on October 5, 2015, Singer sent Hundley an email concerning Plaintiff. (Doc. # 43-4 at 49). Singer wrote that the student Plaintiff had been working with was not responding to her and that Plaintiff had expressed displeasure about her current working environment. (*Id.*). He explained that, "[i]f [Plaintiff] is not happy about the working environment, I understand. Originally, I wanted the class to have both a [male] and female aide." (*Id.*).[11] Singer went on to ask Hundley about the possibility of transferring a specific male aide named David Palmer to Green Valley: "I know of an aide who is interested. . . . Currently, I believe he is working at another site. If there is a possibility of a transfer, however, I would like to meet with the candidate, Mr. David Palmer, first." (*Id.*). Singer later testified that he originally wanted both a male and female aide in Windsor's classroom and that he believed some of the students in that classroom "responded better to a male than female, which further supported [his] wanting . . . that type of balance in the classroom." (Singer Deposition at 114, 132).

On October 15, 2015, Singer met with Hundley to tell her that he did not want Plaintiff to continue working at Green Valley. (*Id.* at 121-27). Four days later, on October 19, 2015, Hundley notified Plaintiff that she would no longer be working at Green Valley. (Plaintiff's Deposition at 52; Hundley Deposition at 40-42). And, two weeks after that, on November 2, 2015, David Palmer began working at Green Valley. (Hundley Deposition at 54-55; Doc. # 43-3 at 37). On November 4, 2015, a Hoover City Schools administrator emailed Hundley to find out whether there had been "a change in personnel at Green Valley," and specifically whether there

---

[11] Singer's email actually reads: "Originally, I wanted the class to have both a female and female aide." (Doc. # 43-4 at 49). But in his deposition, Singer made clear that the use of "female" twice was a typo and that he had originally wanted "both a female and male aide." (Singer Deposition at 113-14).

were "changes for [Plaintiff] at [Green Valley]." (Doc. # 43-3 at 37). Hundley responded: "[Plaintiff] has been switched with David Palmer [who] started on Monday." (*Id.*).

From this Rule 56 evidence, a reasonable jury could find that Singer's decision to have Plaintiff replaced with David Palmer was motivated in part by Plaintiff's sex and/or pregnancy. There are material issues of fact for a jury to decide, and the Board's motion for summary judgment is accordingly due to be denied.

## IV. Conclusion

For the reasons explained above, Defendant's Motion for Summary Judgment (Doc. # 41) due to be denied in its entirety. A separate order will be entered.

**DONE** and **ORDERED** this May 20, 2019.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE